# SUPREME JUDICIAL COURT

FOR THE

COUNTY OF BERKSHIRE, SEPTEMBER TERM 1847,
AT LENOX.

PRESENT:

Hon. LEMUEL SHAW, CHIEF JUSTICE.
Hon. SAMUEL S. WILDE,
Hon. CHARLES A. DEWEY, } JUSTICES.
Hon. SAMUEL HUBBARD,

---

JOHN THOMPSON *vs.* CHARLES C. ALGER.

An oral contract was made in New York for the purchase of rail road stock, and afterwards the buyer paid a part of the agreed price to the seller, but finally refused to pay the balance and take the stock. *Held*, in a suit by the seller against the buyer to recover the residue of the agreed price, or damages for not performing the contract, that the case was not within that clause of the New York statute of frauds, which provides that contracts for the sale of goods or things in action shall be void, " unless the buyer shall, at the time, pay some part of the purchase money."

A contract for the sale of rail road stock by one who has previously pledged it, and of which the pawnee holds the certificate, but which the pawnor is authorized by the pawnee to sell whenever he has an opportunity, is not within the New York statute concerning stockjobbing, which provides that all contracts for the sale or transfer of any certificate of any share or interest in the stock of any incorporated company " shall be absolutely void, unless the party contracting to sell or transfer the same shall, at the time of making such contract, be in the actual

possession of the certificate or other evidence of such share or interest, or be otherwise entitled in his own right, or be duly authorized by some person so entitled, to sell or transfer the said certificate or other evidence of the share or interest so contracted for."

In an action to recover the price of rail road stock alleged to have been sold by the plaintiff to the defendant, or damages for the failure of the defendant to fulfil a contract for the purchase thereof, a certificate of the proper rail road officer, setting forth, in the usual form, that the defendant was the owner of the shares, is *prima facie* evidence of the transfer of those shares to the defendant.

The constitution of the United States authorized that part of the bankrupt act of 1841 which provided for voluntary bankruptcy.

A. made a contract with T. for the purchase of rail road shares, and afterwards paid T. a part of the price: T. subsequently caused the shares to be transferred to A., but he refused to take them, and T. brought an action against him. *Held*, that the measure of damages was the contract price.

THIS was an action of assumpsit, brought by the assignee of Silas A. Stone, a bankrupt on his own petition, to recover the price of one hundred and eighty shares of the capital stock of the Hudson and Berkshire Rail Road Company, or damages for non-fulfilment of a contract made with said Stone by the defendant, in the State of New York, and there to be performed, for the purchase of said stock.

The trial was before *Dewey*, J. whose report was substantially as follows: The plaintiff introduced evidence tending to show that the bankrupt, Stone, on the 21st of August 1841, made an oral contract with the defendant, to sell him one hundred and eighty shares of the stock of said rail road company, at the price of forty five per cent. of the par value of said stock.

The said Stone, called as a witness by the plaintiff, testified that, on said 21st of August, at Hudson, the defendant offered him forty five per cent. for his stock, and they then went into a store, and the defendant computed what the stock would come to at that price, and found it to be $4050, and asked the witness if he would take $1050 in cash, and the defendant's notes at three, six and nine months, with interest, for the rest; that "some conversation was had, whether the notes should be indorsed;" that the witness told the defendant that his said stock was pledged in New York, and that he was deeply involved, and wanted paper that he could use in New York; that he believed he told the defendant that he wished to pay notes to those who held his stock; and that

the conversation then broke off: That the defendant after- wards, on the same day, called on the witness, who agreed to take the first note without an indorser, and the defendant agreed to get an indorser on the two other notes, and to take the stock, but said he should not have time to close the contract on that day, but would be in Hudson in a few days, and close it: That the said parties met again in September following, and had conversation about closing the contract, when the witness told the defendant that he (the witness) had not had time to have the stock transferred, but that he then wanted $400, and if the defendant would let him have that sum, he would have the stock transferred, so that the defendant could have it when he should next be in Hudson; and that the witness gave him a receipt as follows: " Received, Hudson, September 30th 1841, from C. C. Alger, four hundred dollars, on account for rail road stock. Silas A. Stone : " That the parties then separated, and met once or twice afterwards, but nothing was concluded: That at a meeting of the parties on the 19th of November 1841, the defendant paid the witness $250, for which a receipt was given, like the former, except as to the date and sum : That the parties met again in Hudson, in December 1841, when the defendant asked the witness if he was ready to close the contract; that the witness told him he was, and exhibited to him the scrip for one hundred and eighty shares, and re quested him to take it and give the witness the notes, as they had agreed: That the defendant handed some notes to the witness, which were not indorsed, and which the witness told him were not according to the contract, and declined to take ; and that the defendant, on the next day, sued the witness.

I: also appeared, by the testimony in the case, that at some time before said 21st of August 1841, said Stone had been the owner of one hundred and eighty shares of the stock of said company, and that, on said day, no stock stood in his name on the books of the company, except two shares, which were unpledged and unincumbered : That on the 27th of November 1837, said Stone transferred, on the books of

the company, to Cornelius Smith & Co., one hundred and thirteen shares of said stock, which he then owned, and took from them this receipt: "New York, November 27 1837. Received from Silas A. Stone one hundred and thirteen shares of the Hudson and Berkshire Rail Road Company, as collateral security for the payment of $2545 due us at this time, and which stock we agree to return to him on the payment of our account. C. Smith & Co. : " That on the 26th of May 1838, said Stone transferred, on said company's books, forty seven shares of said stock to Freeland, Hoffman & Co., which he then owned, and took from them a receipt as follows: "Received, New York, May 26th 1838, from Silas A. Stone, a transfer of forty seven shares of Hudson and Berkshire Rail Road stock, upon each share $40 having been paid, as collateral security for notes due us at this time. Freeland, Hoffman & Co."

It further appeared, from the testimony of said Stone, that, in March 1841, he exchanged a lot of ground, with John Cressey, for four shares of stock in said company, but did not take a transfer of said stock from said Cressey until the month of October after: That he gave a deed of the land, and took the following written agreement for the transfer of the stock : " For value received, I promise to transfer to S. A. Stone four shares of Hudson and Berkshire Rail Road stock on demand. John Cressey."

It also appeared, by the testimony of the president of said company, that the shareholders in the company were entitled to dividend shares, viz. for every one hundred shares, held by a stockholder, he was entitled to eight dividend shares; that the dividend declared the year before was made payable in forfeited stock.

It appeared that said Stone had no interest in any stock of said company, on said 21st of August 1841, or afterwards, except as follows : The two shares held by him ; the four shares contracted for with Cressey ; the shares conveyed by him to C. Smith & Co., and to Freeland, Hoffman & Co. ; and the dividend shares, to which the said shares were entitled, as aforesaid.

Cornelius Smith, one of said firm of C. Smith & Co., testified that the firm held the one hundred and thirteen shares, so transferred, till October 2d 1841, when one of the firm, at the request of Stone, transferred them to Alger, the defendant, on the books of said company in New York, and surrendered the certificates : That said Smith & Co. frequently advised Stone to sell his stock, supposing the proceeds would come to their use : That Stone had a right to sell the same at all times, they expecting the avails.

A certificate of one hundred and twenty two shares of stock in the usual form, to the defendant, and purporting to have issued from the office of said company, in New York, and signed by John Hopkins, for F. W. Edmonds, the register, was produced by the plaintiff. There was no evidence that any certificates for dividend shares had ever been issued by C. Smith & Co., and there was no evidence, except that above recited, that said Smith & Co. had transferred the stock to Alger, the defendant, which was transferred to them, as aforesaid, by Stone.

It appeared that, on the 13th of October 1841, said Freeland, Hoffman & Co. transferred to said Stone forty seven shares of said stock ; and that said John Cressey, on the 4th of said October, transferred four shares to said Stone, pursuant to his agreement above mentioned ; that five dividend shares were issued to said Stone, by said company, on the said 13th of October ; and that Stone, on the next day, transferred to the defendant, on the books of the company, at Hudson, fifty eight shares of the stock, and that a certificate thereof was made out to him, in the usual form : That the defendant never accepted either said transfer from said Smith & Co., or from said Stone ; and that he was not present at the transfer, either in New York or Hudson.

It appeared that the debts due from said Stone to Freeland, Hoffman & Co., and to C. Smith & Co., remained wholly unpaid ; and said Hoffman and said C. Smith both testified that they received the stock from Stone, under the express understanding that it should be returned to him, when he

should have an opportunity to sell or dispose of it. Said Smith testified that Stone had a right at all times to sell the tock; and Hoffman testified that his firm had at no time any interest in said stock, except what is implied in collat. eral security, and subject to the right to sell the same.

It appeared that said company had a transfer office in New York, and that F. W. Edmonds was the agent there, who eported to the company at Hudson, where the principal office was, transfers of stock at the New York agency. It did not appear, on the books at Hudson, that the defendant owned any stock, except fifty eight shares transferred to him by Stone.

The defendant's counsel objected to the testimony of Smith and Hoffman to the verbal agreement between them and Stone, when he transferred the stock to them, to return the stock to him, when he should have an opportunity to dispose of it, and giving a right to sell it ; because it was repugnant to the written transfer and receipts, or in addition to them. They also objected to Smith's testimony to the transfer by Smith & Co. of said one hundred and thirteen shares of stock to the defendant; and also to said certificate of stock, purporting to be signed by said Hopkins for said Edmonds, as evidence of a transfer ; because the certificate was not competent evidence, and the original transfer book in New York, or some duly authorized transfer, should have been produced.

It was ruled, however, that the certificate was *prima facie* evidence that the party had the stock purporting to stand in his name at the time of the issuing of such certificate. It was also ruled, as to the shares transferred by C. Smith & Co., and by Freeland, Hoffman & Co., and the four shares held under a parol contract with John Cressey, that upon the facts stated in the testimony, and uncontroverted as to Stone's interest in those shares, and his authority to sell to them, a contract by him to sell such shares to the defendant might well be made, and was not in violation of the New York statute against stockjobbing.

The defendant's counsel also moved that the plaintiff be

nonsuited. 1st. Because he had no authority to sue the defendant. 2d. Because the voluntary portion of the bankrupt law of 1841 is repugnant to the constitution of the United States, and consequently the whole proceedings in bankruptcy are void, and no suit can be maintained by the plaintiff, as assignee. 3d. Because the contract is within the New York statute of frauds. 4th. Because the contract is within the New York statute against stockjobbing.

The first three of these points were overruled, and on the fourth the ruling was as already stated.

The cause was submitted to the jury, and the parties consented that the jury should find what should be the damages, provided the plaintiff was entitled to the contract price ; and also what should be the damages for a breach of the contract ; in which latter case, the jury were instructed, that the rule of damages would be the difference between the market price of the stock at the time of a breach of the contract and the contract price.

The jury found a verdict for the plaintiff; and they also found that, in either case, the damages would be the same, as, in their opinion, the stock was of no market value at the time of the breach of the contract.

If any of the foregoing rulings or instructions were incorrect, a new trial is to be granted, or a nonsuit entered, as the court shall order. And the defendant may report the evidence bearing on the amount of damages for his refusing to take the stock, if he desires to save the question of excessive damages.

*S. Stevens*, of Albany, (N. Y.) & *Byington*, for the defendant.

*H. Hogeboom*, of Hudson, (N. Y.) & *Bishop*, for the praintiff.

DEWEY, J. The great questions, in the present case, are those of the proper construction of certain statutes of the State of New York relied upon in the defence as a bar to the plaintiff's right to recover on this action.

I. It is said that this contract is within the statute of frauds

(2 N. Y. Rev. Sts. 1st ed. 136,) providing that "every con-
tract for the sale of any goods, chattels, or things in action,
for the price of fifty dollars or more, shall be void, unless,
1st. A note or memorandum of such contracts be made
in writing, and be subscribed by the parties to be charged
thereby; or, 2d. Unless the buyer shall accept and receive
part of such goods, or the evidences, or some of them, of such
things in action; or, 3d. Unless the buyer shall, at the time,
pay some part of the purchase money." We apprehend that
it is quite clear that the case is not within the first or
second class of cases excepted from the operation of the
statute. If this contract is taken out of the statute, and is
valid in law, it is under the third class of exceptions; "unless
the buyer shall, at the time, pay some part of the purchase
money." That payments have been made by the buyer, in
the present case, which were payments of "some part of the
purchase money," for and on account of this contract, was
clearly proved at the trial, and is made apparent by the report
of the case before us. The defendant, on the 30th of Sep-
tember 1841, paid S. A. Stone $400, and took a receipt of
him of the following tenor: "Received, Hudson, September
30th 1841, from C. C. Alger, four hundred dollars, on account
of contract for rail road stock. Silas A. Stone." And on
the 19th of November 1841, the defendant paid a further sum
of $250, and took a receipt in similar form. These pay-
ments were part of the purchase money for the stock which
Alger contracted to buy and Stone contracted to sell, and
will take the case out of the operation of the statute of frauds,
unless the court sanction the ground taken by the defendant,
that, in order to take the case out of the statute, such pay-
ment must have been made at the precise point of time when
the parties made their original verbal agreement. No such
doctrine has ever been applied to the English statute of
frauds, nor to that of Massachusetts; nor could it be seriously
urged as to either. It is only upon the peculiar language of
the statute of New York that this point is relied upon in the
defence. It is contended that this statute has restricted the

payment to the precise point of time, by the use of the language, "at the time pay some part of the purchase money." In support of this position, the defendant has not, however, referred us to any judicial construction of this statute by the courts of New York, to which we should readily have yielded our concurrence; the question arising, as it does, upon the construction of a statute of that State. In the absence of any such judicial opinion, we must construe it by the best lights afforded us, and give what seems to us a reasonable construction of its provisions. The leading purpose of the statute obviously is, to prohibit the enforcing of a mere verbal contract for the sale of personal chattels of the value of fifty dollars or more, where nothing has been done changing the position of the parties as to the property which is the subject of the contract. It may have been one element, influencing this course of legislation, that if no part of the goods or merchandize, stipulated to be sold, has in fact passed over to the proposed vendee, and if no part of the purchase money has been paid, the effect of holding the contract invalid in law will be only to leave the parties really *in statu quo.* Or, if we suppose the reason for the exception of cases of a part delivery of the goods, or a part payment of the purchase money, from the operation of the statute of frauds, to have been adopted upon the hypothesis, that there had been more solemnity in making the contract, or more formal acts recognizing its existence, all these elements will be found in the case of a payment of the purchase money after the time of making the verbal agreement, as fully as when made at the time of entering into it. In any view we can take of the matter, we perceive no sufficient reason for supposing that the payment, in the contemplation of the framers of this statute, was restricted to a payment made at the precise period of making the verbal agreement. It is doubtless true that, until such payment of part of the purchase money, the contract would be of no validity, and it would be entirely competent for either party to repudiate it. Neither party would be bound by its terms; the vendee would be under no obligation to

make a payment, and the vendor under no obligation to receive one. But when actually made and accepted with the full concurrence of both parties, then the contract takes effect; then a part payment of the purchase money has been made; and then the parties have made a valid contract. This would seem to be a very reasonable construction of the statute, if it was necessary to decide the abstract question of the effect of payment of a part of the purchase money, after the time of entering into a verbal contract.

But, as it seems to us, there are peculiar features in the present case, which avoid all difficulty or doubt upon this point. It is true that the original verbal agreement was made between these parties on the 21st of August 1841; and had nothing further occurred, this verbal contract might have been restricted to that point of time. But such was not the case. On the contrary, these parties met again, as the report finds, further treated on the subject, and then agreed that the defendant should, on that day, pay to Stone $400, in part payment of the purchase money; and if the defendant would thus pay that sum, that Stone would have the stock transferred, so that the defendant could have it the next time he should be in Hudson. Here was a new and further negotiation of the parties, a renewal of the contract, with a new agreement as to the time of transferring the shares; and "at the time" of the making of this last agreement, which is the one that the plaintiff seeks to enforce, the $400 was actually paid, as a part of the purchase money of these shares, which by this agreement were to be conveyed. These facts present a case of payment which, we think, will bring this case within the third class of exceptions from the operation of the statute of frauds.

The case is further strengthened, upon this point, by the fact of a second payment of $250, made by the defendant and accepted by the vendor, on the 19th November 1841, and a receipt in writing taken therefor, as a payment on account of this contract; and the further fact, that the defendant, in December 1841, and after these payments, recognized the

contract as an existing and valid one, and demanded of the vendor the fulfilment on his part, tendering him his (the defendant's) notes, without surety, for the balance that would be due for the stock upon the terms stipulated by the parties. The vendor thereupon offered to transfer the stock to the defendant, upon his giving notes with surety, which, as the jury have found, was the actual agreement of the parties. The court are of opinion that the payment of part of the purchase money on September 30th 1841, under the circumstances stated, was sufficient to take the case out of the operation of the statute of frauds, and that this ground of defence must fail.

II. It is then further insisted, that this contract was void by reason of the provisions of the act against stockjobbing, (1 N. Y. Rev. Sts. 1st ed. 710,) which declare that "all contracts, written or verbal, for the sale or transfer of any share or interest in the stock of any bank, or other company incorporated under any law of the United States, or of any individual State, shall be absolutely void, unless the party contracting to sell or transfer the same shall, at the time of making such contract, be in the actual possession of the certificate or other evidence of such share or interest, or be otherwise entitled in his own right, or be duly authorized by some person so entitled, to sell or transfer the said certificate or other evidence of the share or interest so contracted for." It may be remarked in the outset, that the defendant was apprised of the true state of the vendor's stock, for which he bargained, and that a considerable portion of it was then pledged in New York, as collateral security for his debts. The true ground upon which the objection is placed is, therefore, not that there was any concealment, or misrepresentation by the vendor, on this point, but that assuming both parties well understood the sale to be of stock thus pledged, yet that a contract for the sale of pledged stock, by the pawnor or mortgagor, would be in violation of the provisions of the statute.

The stock of S. A. Stone, which is the subject of the

controversy, was held partly by Cornelius Smith & Co. of New York, under a transfer to them dated November 27th 1839, for which they, at the same date, gave their receipt, stating the same to be received as collateral security for the payment of $2545, which stock they agreed to return to him on the payment of their account; and partly by Freeland, Hoffman & Co. by a similar transfer as collateral, May 26th 1838, and with a like written acknowledgment thereof by the pledgees.

The form of transfer on the books of the rail road company was, in both cases, absolute. The receipt given by the parties stated the true nature of it, and that it was to be a pledge, and that the transfer was as collateral. In both cases, the evidence is full and direct, so far as parol evidence is competent to the point, that Stone was verbally authorized, by those who held it as collateral, to sell the stock. Cornelius Smith says, in his deposition, " Stone had the liberty, at all times, to dispose of the stock." Peter Hoffman says, as to the transfer to Freeland, Hoffman & Co., " said stock was received with the express understanding that it should be returned to him at any time when he should have an opportunity to sell or dispose of the same." Again he says, " we had no other interest in the stock, than what is implied in the term 'collateral security,' subject to his right to sell the same." It further appeared in evidence that the individuals, to whom the stock had been thus transferred as collateral, recognized their obligation to Stone, permitted him to sell, and released all their interest in the stock, to enable him to fulfil his contract ; and this without requiring any further payment or security for their debts. The case is then one of a professed sale of stock, then pledged, a discharge seasonably acquired from the pledgees of their interest, and an actual transfer to the vendee, within the time required by the contract of sale.

It is, however, contended that all these circumstances cannot avail the plaintiff, because, it is said, Stone had not the actual possession of such shares, nor was he otherwise entitled in *his own right,* or duly authorized by the persons so entitled

to sell or transfer the said shares, as stipulated in such contract. As between the pledgor and pledgee, Stone had an interest in this stock, to a certain extent at least, and was entitled, in his own right, to enjoy such interest. The pledgees had recognized it in writing, and might have been compelled to make the necessary transfer of the same to him. He was also verbally authorized, by the pledgees, to contract for the sale of these shares. As between these parties, (and no rights have ever passed to others, and no suggestion is made of any transfer by the pledgees to third persons,) there was a *right of property* in Stone.

It is true that the stock was standing on the books of the corporation, in the name of the pledgees; and had they conveyed it to a *bona fide* purchaser, without notice of the real transaction, the property would have passed thereby, and the right of Stone to the stock might have been lost. But no such transfer took place; the pledgees did not abuse their trust. They agreed to hold it as collateral, with the right, on the part of the pledgor, to sell at any time; they relying solely upon his fidelity to them to pay their several debts. We cannot suppose that the legislature of New York, in their act to prevent stockjobbing, had in view a case like the present, or that it was intended thereby to restrict *bona fide* sales of stocks pledged or mortgaged, by the mortgagor or pledgor. The policy of the act, and its leading purpose, doubtless were to prevent gambling in the rise and fall of stocks. The evil to be remedied was that of fictitious sales of stocks, stocks never owned, nor contemplated to be owned, or to be under the control or disposition of the vendor. Such sales are understood by the parties to be merely nominal; the party contracting to sell at a future day, at a certain price named, virtually assuming to pay the other party the difference between the market price on that day and the price stipulated to be paid, if the latter be less than the former; and the vendee, in like manner, stipulating to pay the vendor the difference, if the market price exceed the contracting price. We cannot suppose it to have been intended to apply

to contracts for the sale of stocks by one who was the equi-
table owner thereof, having a present right to them, subject
only to a lien by way of mortgage or pledge, and in the
hands of a pledgee or mortgagee who had virtually author-
ized the sales, and was ready to join in any proper conveyance
to revest the title in the pledgor, and give effect to his con-
tract.

Four of the shares which were contracted to be trans-
ferred to the defendant were held by Stone under a purchase
from John Cressey, made in March 1841. They had been
paid for by a conveyance of land; and Stone had received
a writing from Cressey, of the following tenor : " For value
received, I promise to transfer to Silas A. Stone four shares
of Hudson and Berkshire Rail Road stock on demand.
John Cressey." This stock, in one respect, is liable to the
same objection, as the shares in the hands of Smith & Co. :
viz. the stock was standing in the name of Cressey on the
books of the corporation ; and if that were a decisive test, this
stock, as well as the other referred to, would not, under the
statute, be the subject of contract for sale. We have taken
a different view of the matter, and do not think that fact
decisive against the plaintiff, but that it is competent for him
to show that the stock was really Stone's property, and
under his control ; that the sale was a substantial sale of stock
in which he was then interested, and not a fictitious bargain.
These four shares Cressey was legally bound to convey to
Stone on demand; and he might have been compelled to
make such conveyance, if he had refused. Stone was the
equitable owner, and as such had the right to contract for the
sale of the shares ; and having procured the legal transfer to
himself seasonably to fulfil his contract with the defendant,
that was sufficient.

The remaining shares, necessary to constitute the entire
number contracted to be sold, consisted of two shares standing
in Stone's own name, and of dividend shares attached to the
shares pledged. We are of opinion, upon these facts, that the
objection taken to this contract as bad, and in violation of the

statute of the State of New York to prevent stockjobbing, is not well maintained.

III. The defendant also objected, on the trial, to the evidence offered to show the transfer of shares to him. This evidence consisted simply of the certificates, issued by the proper officers, in the name of the defendant, setting forth, in the usual form, that the defendant was the owner of a certain number of shares therein stated. The defect in the evidence, as suggested at the trial, was the non-production of the stock leger, or original book of transfers; but its production was held unnecessary, and the certificates were held sufficient *prima facie* evidence of the transfer. This ruling, in the opinion of the court, was correct.

IV. A graver objection was raised as to the right of the assignee in bankruptcy of said Silas A. Stone to institute this action in his own name. The only ground stated for the objection was the broad one, that the United States bankrupt law of 1841 was unconstitutional; and it was said to be so, because of its enlarged provisions embracing cases of voluntary applications by the debtor for the benefit of the act. The powers of the general government, it was contended, were restricted to a bankrupt law, such as was known and familiar to us as the English bankrupt law. The point was raised, but not argued at length; and I do not propose now to enter upon a discussion of it, but merely to say enough to dispose of it. It seems to us to be no longer an open question. The act has been indirectly sustained in all the courts of the United States. Indeed, it has not been seriously questioned, unless it may have been in *Kunzier* v. *Kohaus,* 5 Hill, 317, where a majority of the supreme court of New York sustained the law. It has not, so far as I am aware, ever been directly brought before the supreme court of the United States, but has been before inferior tribunals. See 1 Howard, 277. We think it must be considered as now fully settled to be an act within the powers of congress, as conferred by the constitution, and as such we are to give it effect.

**V.** A further question was raised on the point of the amount of damages given by the jury. The plaintiff contended that the only measure of damages was the sum stipulated to be paid for the stock. The defendant, on the other hand, insisted that the measure of damages should be only the difference between the market value of the stock on the day of the refusal by the defendant to take it, and the sum he agreed to pay therefor. To present this question fully before the court, the jury were directed to assess damages in reference to each of these modes· of computation; and they found that the damage would be the same in either case ; finding the stock to be of no value at the time of the breach of the contract. Upon this last finding, a question was reserved as to its being a verdict against the weight of the evidence, and to be considered by the full court, if in their view it was material in the result. In the view we have taken of this case, that finding is not material ; as the plaintiff is entitled to recover the whole amount stipulated to be paid for the stock. The argument against such recovery is, that this stock was never accepted by the defendant ; that this, at most, was a mere contract to purchase ; and that the defendant, having repudiated it, is only liable to pay the difference between the agreed price and the market value of the stock on the day of the delivery. Such would be the general rule as to contracts for the sale of personal property ; and such rule would do entire justice to the vendor. He would retain the property as fully in his hands as before, and a payment of the difference between the market price and that stipulated would fully indemnify him. Such would have been the rule in this case, if nothing had been done to change the relation of the parties. If, for instance, the defendant had repudiated the contract, before any transfer of stock to him had been made on the books of the corporation, it might properly have applied here. But this is a case of somewhat peculiar character in this respect. The contract of the vendor to sell to the defendant one hundred and eighty shares of rail road stock required a previous transfer of the shares on the books of the corporation. This, from

the very nature of the case, was a previous act; and when done, it passed the property on the books of the company to the defendant. This was done by the vendor as early as October 14th 1841, in respect to all the shares stipulated to be sold. At this time, the defendant had not repudiated the contract. On the contrary, he paid $250 upon this contract on the 19th of November 1841. The vendor had made the transfer on the books, and had obtained the proper certificates ready to be delivered to the defendant, according to the contract, and was ready in all things to fulfil, when the defendant, in December 1841, refused to make the stipulated payment therefor, in indorsed notes, as the jury find to have been the contract. In this state of the case, as it seems to us, the true rule of damages is the contract price. The stock has been transferred to Alger on the books of the corporation, and the vendor, having done this, in the proper execution of the contract, and before it was repudiated by the defendant, may well insist upon this rule as the measure of damages. Stone fulfilled his part of the contract, and has transferred his interest in the property to the defendant. Such being the case, the measure of damages is properly the contract price of the stock, which is in accordance with the finding of the jury as to the amount of damages.

*Judgment on the verdict*